# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ARTHUR LEE GARRISON,

    Plaintiff

v.

A. GREGERSON, et. al.,

    Defendants

Case No.: 3:17-cv-00391-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 247

     This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 247, 247-1 to 247-12, 249-1 to 249-4.) The motion was served on Plaintiff on January 21, 2021. (ECF No. 247 at 13.) On January 22, 2021, District Judge Du issued an order advising Plaintiff of the requirements for opposing the motion for summary judgment, and ordered the opposition to be filed within 21 days. (ECF No. 251.) Plaintiff did not file a response to the motion for summary judgment. Plaintiff did file a document he titled "Motion to Show Just Cause for Jury Trial" (ECF No. 246), but this was filed the day *before* Defendants' filed and served their motion for summary judgment; therefore, it could not be a response to the motion. Defendants nevertheless treated it as such, and filed a reply brief. (ECF No. 258). That document does address each of Plaintiff's claims, and because Plaintiff is proceeding pro se, the court will also treat it as his response to Defendants' dispositive motion.

After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. The events giving rise to this action took place while Plaintiff was housed at High Desert State Prison (HDSP) and Ely State Prison (ESP). This action is proceeding on the Fourth Amended Complaint. (ECF No. 129.)

The court screened the Fourth Amended Complaint and allowed Plaintiff to proceed with a claim under the Eighth Amendment for deliberate indifference to his serious medical need concerning his throat/sinuses as well as a retaliation claim related to allegations concerning medical care for his throat/sinus issues and a transfer from HDSP to ESP. (ECF No. 128.)

The Eighth Amendment claim was allowed to proceed against defendants Brown, Matousek, Stoke, Dr. Koehn, A. Gregerson, Melissa Mitchell, Dr. Schlager, Dr. Romeo Aranas, and Dr. Scott Manthei. Plaintiff was allowed to proceed with claims for retaliation against Mitchell, Neven, Russell, and Smith. (*Id*.)

Stoke, Smith and Dr. Schlager have been dismissed without prejudice for failure to timely serve them under Federal Rule of Civil Procedure 4(m). (ECF Nos. 237, 244.) Therefore, this action is proceeding against Dr. Romeo Aranas, Guy Brown, Angela Gregerson, Dr. Scott Manthei, Julie Matousek, Melissa Mitchell, Dwight Neven, and Perry Russell.

Defendants move for summary judgment, arguing that they were not deliberately indifferent to Plaintiff's serious medical needs, Plaintiff was not retaliated against, and alternatively, they are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

3

1  determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

2  *Anderson*, 477 U.S. at 249.

3      In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

4  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

5  come forward with evidence which would entitle it to a directed verdict if the evidence went

6  uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

7  the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

8  *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

9  omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

10  defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

11  an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

12  party cannot establish an element essential to that party's case on which that party will have the

13  burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

14      If the moving party satisfies its initial burden, the burden shifts to the opposing party to

15  establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

16  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

17  dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

18  be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

19  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

20  (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

21  by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

22  U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

23

4

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Preliminary Matters**

    **1. Rule 56(d)**

        In his filing, Plaintiff states, without any elaboration, that the motion should be denied if

a party has not had an opportunity to make discovery, and that because the Fourth Amended

Complaint has not yet been screened, he has not had an opportunity to conduct discovery. (ECF

No. 246 at 4.) Plaintiff is mistaken. Plaintiff filed his original complaint on June 22, 2017. (ECF

Nos. 1-1 to 1-14.) He then filed an amended complaint (first amended complaint or FAC) on July

6, 2017, followed by various exhibits. (ECF Nos. 3, 4, 4-1, 5.) The FAC was dismissed without

prejudice, and leave to amend was deferred while the court ruled on his motions for appointment

of counsel/guardian ad litem. (ECF No. 9.) On July 23, 2018, the court denied the motion for

appointment of counsel/guardian ad litem, and allowed Plaintiff to file a second amended

complaint (SAC). (ECF No. 18.) Plaintiff filed his SAC on August 14, 2018. (ECF No. 22.) The

SAC was dismissed with leave to amend. (ECF No. 32.) Plaintiff then filed his third amended

complaint (TAC) on November 27, 2018. (ECF No. 34.) The court screened the TAC and

allowed some claims to proceed, but dismissed others with and without prejudice. (ECF No. 35.)

The case was then stayed while the parties participated in an early mediation conference, but the

parties were unsuccessful in settling the case. (ECF No. 43.) Defendant Matousek filed her

response to the TAC on June 20, 2019. (ECF No. 49.)

        The court entered a scheduling order the following day, giving the parties until

September 19, 2019, to complete discovery. (ECF No. 50.) On the defense's request, the court

1  extended the discovery completion deadline to November 8, 2019. (ECF No. 64.) Then, on

2  Plaintiff's request, the court extended the discovery completion deadline to January 7, 2020.

3  (ECF No. 87.) On December 2, 2019, Plaintiff filed his motion for leave to file the Fourth

4  Amended Complaint. (ECF No. 101.) On February 24, 2020, the court granted the motion to file

5  the Fourth Amended Complaint, screened the Fourth Amended Complaint, and vacated the

6  scheduling order deadlines. (ECF No. 128.)  On April 8, 2020, the court entered a new

7  scheduling order, with a new discovery completion deadline of July 7, 2020. (ECF No. 140.) On

8  Plaintiff's request, the court extended the discovery completion deadline by 90 days to October 5,

9  2020. (ECF No. 145.) In that order, the court said there will be no further extensions barring

10  unforeseen and extenuating circumstances. (*Id.*) Therefore, Plaintiff has had an opportunity to

11  conduct discovery.

12      Plaintiff then filed a motion where it appeared that he sought to further extend the

13  discovery completion deadline, but the motion was 139 pages in length, and attached numerous

14  grievances. Plaintiff did not state what additional discovery he sought to propound, he failed to

15  comply with Local Rule 26-3, and he did not explain what circumstances justified a further

16  extension. Therefore, the October 5, 2020 discovery completion deadline remained in place.

17  (ECF No. 180.)

18      Plaintiff did not subsequently file a motion that set forth sufficient grounds for extending

19  the discovery completion deadline any further. To the extent his statement in this filing can be

20  construed as a request under Federal Rule of Civil Procedure 56(d), it is likewise insufficient.

21  Plaintiff has not shown by affidavit or declaration that he cannot present facts needed to oppose

22  Defendants' motion. Nor has he explained "what further discovery would reveal that is essential

23  to justify [his] opposition to the motion[.]" *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir.

2018) (citation and quotation marks omitted). Plaintiff was required to state "what other *specific* evidence" he hopes to discovery and the "relevance of that evidence to [his] claims." *Id.* (citation and quotation marks omitted, emphasis original).

For these reasons, Plaintiff's request to deny the motion under Rule 56(d) should be denied.

### 2. Plaintiff's Request to Strike Certain Documents

Plaintiff asks that certain documents be stricken, including: ECF No. 116-2; ECF No. 116-1 at 1-4; ECF No. 116-6 at 1-2; ECF No. 116-4 at 1-20.

ECF No. 116-2 is an Investigation Detail Report concerning an incident where Plaintiff was found to have a prison-made weapon ("shank"). ECF No. 116-1 contains Plaintiff's historical bed assignments. ECF No. 116-4 is a redacted offender information summary. ECF No. 116-6 is a June 23, 2015 incident report regarding an incident where Plaintiff was found to have contraband hidden in his property, including prison-made weapons. These were exhibits to a prior motion for summary judgment that was denied as moot when Plaintiff was granted leave to file his Fourth Amendment Complaint.

In any event, the court has already ordered ECF Nos. 116-2, 116-4 and 116-6 sealed. (ECF No. 131.) Plaintiff has not set forth any additional basis for striking these documents.

The court previously ruled that it found no basis for sealing or striking Exhibit A (ECF No. 116-1), the historical bed assignments, and Plaintiff has not presented any further basis for sealing or striking this document. (ECF No. 128.)

In sum, Plaintiff's current request to strike these documents should be denied.

**B. Eighth Amendment**

    **1. Standard**

    "The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

    A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104);  *see also Akhtar*, 698 F.3d at 1213.

    If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the

official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**2. Medical Evidence**

Plaintiff complained of swollen lumps and a sore throat on July 18, 2014, and he was referred to a medical provider. (ECF No. 249-1 at 28.) He was seen on October 10, 2014, with a notation that his symptoms continued despite completing antibiotic treatment. He was diagnosed with chronic pharyngitis, and was prescribed Erythromycin and Chloraseptic. (ECF No. 249-1 at 27.) He was seen on October 23, 2014, and it was noted he had no improvement after being on

antibiotics for ten days. He was referred to Dr. Holmes to assess his hoarseness, and for a possible referral to an ENT. (ECF No. 249-1 at 26.) He saw Dr. Holmes on November 13, 2014, who requested referral to an ENT. (ECF No. 249-1 at 25; ECF No. 249-2 at 71.)

Plaintiff saw seen at Nevada Ear & Sinus on February 20, 2015. Defendants reference a Dr. Sean Palacios, but the provider Plaintiff saw is listed as Dr. Scott Manthei (and another record reveals that Dr. Palacios is the medical director for Nevada Ear & Sinus).(ECF No. 249-2 at 35.) Plaintiff complained of a raspy voice for one year and pain swallowing, with the feeling of a persistent foreign body in the throat. He had been on multiple antibiotics without relief. Dr. Manthei observed a lingual cyst. Plaintiff was diagnosed with acute pharyngitis and nasopharyngitis. He recommended a three week course of Clindamycin, noting that it should help resolve Plaintiff's symptoms. If the antibiotic failed to relieve the symptoms, Dr. Manthei recommended a CAT scan of the paranasal sinuses. If the symptoms persisted, he would follow up with Plaintiff. (ECF No. 249-2 at 15-17.)

On March 18, 2015, it was noted Plaintiff was only taking half of the dose of Clindamycin, he was advised to take the antibiotic and was prescribed Chloraseptic. (ECF No. 249-1 at 25.)

Plaintiff was received at ESP from HDSP on June 10, 2015. (ECF No. 249-1 at 24.) He saw Dr. Koehn on June 17, 2015, regarding the throat cyst that had been identified by  Dr. Manthei. It was noted that the issued antibiotics had no effect on Plaintiff's symptoms. Dr. Koehn said he would get Plaintiff's medical history from the records (that were presumably being sent from HDSP) and then would consider a repeat consultation with the ENT. (ECF No. 249-1 at 24.)

Dr. Koehn requested a referral to the ENT for a follow up on July 27, 2015.

(ECF No. 249-2 at 55.) This was approved, and an appointment was scheduled with Dr. Manthei on September 11, 2015. (*Id.*) There is also a referral for a sinus CT scan to be sent to Dr. Manthei, and this was approved on September 10, 2015. (ECF No. 249-2 at 48.)

Plaintiff saw Dr. Manthei again on September 11, 2015, and noted that Plaintiff did not feel better after the round of Clindamycin. Dr. Manthei recommended surgery including a left sphenoidotomy, and direct laryngoscopy and removal of the lingual cyst as well as esophagoscopy. Dr. Manthei said he saw no indication for further antibiotics as there had been no change with his symptomatology, and there was a risk of developing a super bug. Plaintiff would, however, be placed on post-operative antibiotics prophylactically. (ECF No. 249-2 at 4-5.) Plaintiff was given Tylenol for his pain on September 23, 2015. (ECF No. 249-1 at 23.)

Plaintiff had the surgery on October 14, 2015. (ECF No. 249-2 at 9-14.) On October 22, 2015, he reported his voice was slightly hoarse, but it was improving. (ECF No. 249-1 at 22.)

Plaintiff saw Dr. Manthei following surgery on October 26, 2015, and it was noted he was doing well after surgery. The pathology was benign, and Dr. Manthei said there was no follow up necessary. (ECF No. 249-2 at 2.)

On December 29, 2015, Plaintiff complained of throat issues, and he was scheduled with a provider. (ECF No. 249-1 at 19.)

Plaintiff was seen on January 25, 2016, for complaints of voice box pain. His thyroid palpated firm to the touch bilaterally, but there were no cysts or lumps at the collarbone where he had complained. (ECF No. 249-1 at 18.) He was given Chloraseptic for throat irritation on January 29, 2016. (ECF No. 249-1 at 17.)

He was seen on September 19, 2016, for complaints of nasal congestion and a hoarse voice and feeling of fullness in his throat. He was assessed with allergic rhinitis and history of a

1  cyst. He was referred to Dr. Baker to assess for possible referral to an ENT. (ECF No. 249-1 at

2  16.)

3       Plaintiff complained of voice hoarseness again on October 12, 2016. He had no

4  observable polyps, lesions or masses. He was referred to an ENT to rule out polyps. He was

5  prescribed Cipro and a nasal spray. (ECF No. 294-1 at 15; ECF No. 249-3 at 20; ECF No. 249-2

6  at 47.) On November 18, 2016, he was scheduled to see Dr. Schlager. (ECF No. 249-1 at 14.) He

7  saw Dr. Schalger, and a CT of the soft tissue of the neck was ordered. (ECF No. 249-2 at 22, 23,

8  45.) This was authorized. (*Id.*; ECF No. 249-2 at 44.) A note on October 11, 2017, indicates that

9  the CT was done and was normal, but Plaintiff's symptoms continued. (ECF No. 249-2 at 43.)

10  Plaintiff failed to show up for his appointment on December 11, 2017. (ECF No. 249-1 at 8.)

11  **3. Dr. Aranas**

12       Plaintiff alleges that Dr. Aranas said he would make sure Plaintiff received all necessary

13  treatment, but sided with the other defendants and did not ensure Plaintiff received treatment.

14       Dr. Aranas does not recall having any direct interaction with Plaintiff, and never treated

15  Plaintiff nor denied him medical care. Other than responding to grievances, he had no contact

16  with Plaintiff. (Dr. Aranas Decl., ECF No. 247-11 at 3.)

17       Plaintiff provides evidence that Dr. Aranas responded to Plaintiff's second level

18  grievance (grievance 20063016500) around June 22, 2017, stating that Plaintiff had a sinus

19  infection and an abscess, which required surgical intervention and IV antibiotics, but Plaintiff

20  had not demonstrated his rights had been infringed upon, or that NDOC procedures were

21  violated or that he suffered harm. The grievance was nevertheless partially granted. (ECF No.

22  246 at 48.)

23

Plaintiff does not provide the actual grievance that he sent to which Dr. Aranas responded; however, Dr. Aranas' response that Plaintiff had a sinus infection and abscess that required surgical intervention and IV antibiotics does not demonstrate Dr. Aranas was deliberately indifferent to a serious medical need. At most, it reveals that Dr. Aranas reviewed Plaintiff's medical file and advised Plaintiff what had occurred. This does not establish that he knew of and disregarded a risk to Plaintiff's health. Therefore, summary judgment should be granted in Dr. Aranas' favor.

**4. Dr. Scott Manthei**

Plaintiff alleges that Dr. Manthei did not give Plaintiff antibiotics or anything for his pain when he was transferred back to HDSP on September 9, 2015, and on September 10, 2015, his scan showed a massive infection. The next day, Plaintiff was told he required surgery related to the infection and cyst.

Dr. Manthei states that he treated Plaintiff, on a contract basis, regarding his sinus infection issues. Prior to seeing Plaintiff on September 11, 2015, Plaintiff was taking Erythromycin, an antibiotic. After Dr. Manthei's examination, he recommended a direct laryngoscopy, and removal of a lingual cyst as well as an esophagoscopy. Dr. Manthei did not see an indication for further antibiotics as there was no change in his symptomology and there would be a risk of developing a super bug. Plaintiff was placed on post-operative antibiotics prophylactically. (Mathei Decl., ECF No. 247-12.)

Plaintiff does not point to any medical records that contradict Dr. Manthei's statements in his declaration. Nor does he point to any evidence that substantiates his allegation that Dr. Manthei was deliberately indifferent to a serious medical need. Therefore, summary judgment should be granted in Dr. Manthei's favor.

**5. Dr. Koehn**

Plaintiff alleges that on June 12, 2015, Dr. Koehn told Plaintiff he did not have the medical file and laughed and told Plaintiff, "If I don't diagnose your problems I never need to treat them." He avers that Dr. Koehn refused to give him any treatment until August 2015, and said he did not care if Plaintiff was treated or not. When Plaintiff told Dr. Koehn his throat was in pain, he claims Dr. Koehn said he was tired of inmates and did not care about Plaintiff's pain.

Plaintiff does not submit a declaration to substantiate his allegations against Dr. Koehn. Instead, Plaintiff's medical records contradict Plaintiff's allegations, and demonstrate that Plaintiff saw Dr. Koehn shortly after he arrived at ESP. Dr. Koehn noted that the antibiotics Plaintiff had previously been prescribed had not helped his symptoms, and said that he would get Plaintiff's medical records (which were presumably being transferred to ESP from HDSP), and would consider a repeat consultation with Dr. Manthei. Not long thereafter, Dr. Koehn requested a referral to the ENT for a follow up, which was approved, and Plaintiff was scheduled to see Dr. Manthei on September 11, 2015. Plaintiff was also approved for a sinus CT the day before his appointment with Dr. Manthei.

There is no evidence that Dr. Koehn was deliberately indifferent to Plaintiff's serious medical need; therefore, summary judgment should be granted in Dr. Koehn's favor.

**6. Melissa Mitchell**

Plaintiff alleges Mitchell was deliberately indifferent because it took Plaintiff 11 months to get a CAT scan.

In her declaration, Mitchell says she has no recollection of any encounter with Plaintiff, and as a registered nurse, is not responsible for scheduling outside appointments or diagnostic

consultations. She is not a member of the Utilization Review Panel (URP), and has no input on the approval of any medical procedure or appointment. (Mitchell Decl., ECF No. 247-9.)

In his response, Plaintiff says that Mitchell was overheard saying she "wanted that piece of shit out of her prison." Plaintiff gives no context to this statement, or state who overheard her make this statement, or when it occurred. Plaintiff also states that he filed a grievance against Mitchell and she told him there was nothing wrong with him and he would be treated when she decided. Plaintiff does not provide a copy of this grievance or response. Nor does he provide any other evidence to support his claim that she was deliberately indifferent with respect to his medical care. Importantly, Plaintiff has not submitted evidence that raises a dispute of fact as to whether Mitchell had any input into the scheduling of CAT scans, which is the basis of his Eighth Amendment claim against her. Therefore, summary judgment should be granted in Mitchell's favor.

**7. Guy Brown**

In his Fourth Amended Complaint, Plaintiff alleges that Brown transferred him to a non-medical unit on October 18, 2015, after he had major surgery on his throat on October 14, 2015, and that this was against doctor's orders that he be housed in a medical building. Plaintiff contends this resulted in severe pain, a lack of medications and food, vomiting and diarrhea that required several rounds of intravenous fluids over three days. He avers that a doctor subsequently told him he should not have been moved.

Plaintiff does not point to any evidence to corroborate his bare allegations. Moreover, his medical records do not reflect any orders that he was ordered to be housed in the medical building, or that a doctor said he should not have been moved. Nor is there evidence that moving him outside the medical building caused him to suffer in pain or caused his other symptoms.

Furthermore, there is no evidence of Brown's involvement in the move, or even if he was involved, that Brown moved him in disregard of a risk to Plaintiff's health. Therefore, summary judgment should be granted in Brown's favor.

### 8. Julie Matousek

Plaintiff alleges that Matousek threw away his medications, and he suffered in pain and developed an infection as a result.

There is absolutely no evidence in the record that Matousek threw away Plaintiff's medications. Therefore, summary judgment should be granted in Matousek's favor.

### 9. A. Gregerson

In the Fourth Amended Complaint, Plaintiff alleges that Gregerson told him she would get him throat medication, but it took over two months to provide the medications.

In his response, Plaintiff asserts that Gregerson took months to refill his Chloraseptic throat spray when he was back at ESP in December of 2015.

Plaintiff's medical records reflect that Plaintiff complained of throat issues on December 29, 2015, and he was scheduled with a provider. (ECF No. 249-1 at 19.) Plaintiff was seen on January 25, 2016, and was given Chloraseptic for throat irritation on January 29, 2016. (ECF No. 249-1 at 17.) Therefore, a month passed in between when Plaintiff complained of pain and when he was seen and given Chloraseptic, which contradicts Plaintiff's bare allegation that Gregerson took months to give him the medication. Moreover, there is no evidence that Plaintiff complained to Gregerson between the time he complained of throat pain at the end of December 2015, and when he received the throat medication at the end of January 2016. In the absence of evidence of deliberate indifference, summary judgment should be granted in Gregerson's favor.

**C. Retaliation**

    **1. Standard**

    "Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

    **2. Mitchell**

    Plaintiff alleges that in November of 2016, Mitchell was the subject of his grievances, and when he was waiting for a CAT scan Mitchell told him, "snitchy grievance filing inmates don't deserve treatment." In addition, he claims that she told him he would not get treatment because he filed a lawsuit and she was on the committee.

    Mitchell states in her declaration that she has no recollection of any encounter with Plaintiff, and never said anything remotely similar to Plaintiff's allegations. In addition, she is not a member of the URP and has no bearing or input on the approval of medical procedures or appointments and is not responsible for scheduling outside appointments or diagnostic consultations. (Mitchell Decl., ECF No. 247-9.)

    In his response, Plaintiff merely repeats his allegation that Mitchell told him grievance-filing inmates do not deserve treatment, but he provides no evidence regarding when she allegedly made this statement. Moreover, he provides no evidence that Mitchell actually took

17

any adverse action against him as a result of filing grievances. He does not point to anything to substantiate his claim that she had any involvement in a purported delay of his CAT scan. Nor is there any other evidence that Mitchell took any adverse action against him. Therefore, summary judgment should be granted in Mitchell's favor.

### 3. Neven and Russell

Plaintiff alleges that Neven was the subject of several grievances Plaintiff had filed, and another correctional officer told plaintiff, "you know better than to file grievances against Neven." Plaintiff claims that Neven transferred Plaintiff from HDSP to ESP while Plaintiff was still waiting for medical treatment because Plaintiff had accused Neven of theft. Staff at ESP purportedly told Plaintiff he messed up by filing grievances against Neven because Neven used to be the warden at ESP and still had power there.

Plaintiff alleges that Russell informed Plaintiff he was sick of Plaintiff filing grievances, and would ensure that Plaintiff disappeared. Plaintiff later asked Russell why he was being treated so poorly, and Russell told Plaintiff that he would not be treated well no matter what. Plaintiff avers that Russell subsequently ordered him transferred to ESP.

According to Defendants, on March 18, 2014, HDSP staff discovered Plaintiff had a prison-made weapon (shank) in his possession, and as a sanction, Plaintiff received 180 days in disciplinary segregation and was transferred to ESP. After serving additional disciplinary segregation time for further infractions, Plaintiff returned to HDSP in September 2015 for medical treatment.

The evidence reflects that Plaintiff was at HDSP, and on March 18, 2014, he was discovered to have a prison-made weapon (a "shank") in his possession. (ECF No. 247-2 at 2.) Plaintiff was found guilty of the charge and was sanctioned to 180 days in disciplinary

segregation (DS). (ECF No. 247-3 at 2.) Plaintiff was brought into administrative segregation (ad-seg) at HDSP due to his pending disciplinary charge, and it was noted that he needed to have a full classification committee hearing for proper placement as it appeared he was unable to go to general population (GP). He would remain in close custody in ad-seg pending the outcome of the disciplinary charge and full classification committee review. (ECF No. 247-7 at 11.)

Plaintiff was charged with another disciplinary offense on March 29, 2015, while still at HDSP, but he was found not guilty. (ECF No. 247-3 at 2; ECF No. 247-4 at 2.) On April 29, 2014, Plaintiff was still in ad-seg pending his disciplinary charge. There is a notation on May 15, 2014, that Plaintiff was found guilty of the May 18, 2014 charge and was sanctioned with 180 days in DS, which would expire on November 11, 2014. (ECF No. 247-7 at 11.) There is a notation on July 3, 2014, that there was a meeting with Plaintiff to discuss his DS time and a "possible early kick out." It was noted Plaintiff did not want to go to GP, so he would continue his DS time. (*Id*.)

On August 15, 2014, there is a note that "t/c" was given on this date (presumably referring to a time cut), and his "out date" from DS was adjusted to October 12, 2014. He was still at HDSP at this time. A notation on October 6, 2014, indicated that Plaintiff had completed his DS time, and he was then placed in ad-seg pending a full classification committee review for proper placement. (*Id*.) On October 9, 2014, it was indicated that Plaintiff did not feel safe in GP and needed to be re-classified to close custody ad-seg at *Lovelock Correctional Center (LCC)*. (*Id*.) The members of the committee that made that determination were Barrett, Nash and Scott. On October 27, 2014, it was formally recommended that Plaintiff be transferred to close custody, ad-seg at LCC. (*Id*.)

Between November 17, 2014, and May 4, 2015, Plaintiff was pending approval for transfer to LCC. (*Id*. at 12.) Russell updated the case note on May 6, 2015, stating that Plaintiff was okay in HDSP close custody, ad-seg while pending transfer to LCC. (*Id*.)

There is a case note dated June 5, 2015, stating that Plaintiff was serving 180 days DS for a guilty charge that started May 16, 2015, and his "out date" for DS was November 16, 2015. (Id. at 13.) There is also an updated case note on June 8, 2015, by N. Flores, that Plaintiff was approved to transfer to *ESP* to finish his DS time, even though Plaintiff had already completed his DS time for the March 2014 disciplinary charge and had been recommended for transfer to *LCC*. (*Id*. at 12.)

On June 10, 2015, the case note states that Plaintiff was cleared for transfer from HDSP to ESP/LCC. Plaintiff arrived at ESP on June 10, 2015, and the case note states that he was there to serve DS time from a charge that occurred on March 18, 2014. The notation from June 11, 2015, states that on further review, Plaintiff had completed his DS time and would be housed as "MLU" ad-seg until he could be reviewed for possible transfer to LCC, which is where he was originally scheduled to go. (*Id*. at 13.) The case note from June 12, 2015, states that Plaintiff was mistakenly approved for ESP DS, and that the committee would recommend transfer to LCC; however, the case note was updated on July 29, 2015, by Moore, stating that Plaintiff now had more DS to serve. (*Id*.) This is because Plaintiff faced disciplinary charges for possession of contraband at ESP on June 23, 2015. (ECF No. 247-3 at 2; ECF No. 247-4 at 2.)

Plaintiff was sent to HDSP for medical treatment in September through November of 2015. (ECF No. 247-7 at 13-14.) He returned to ESP to complete his DS sanction on December 10, 2015. (*Id*. at 14.) His "out date" for that DS sanction was January 17, 2016. A case note on

December 24, 2015, indicates his DS sanction was suspended, and he was placed in ad-seg, and remained there because he refused to double cell. (*Id*. at 14-15.)

In sum, the evidence reflects that Plaintiff completed his DS time for the March 18, 2014 disciplinary charge while still at HDSP, and then he was approved for transfer to LCC, but was mistakenly sent to ESP. Once at ESP, this mistake was discovered, and Plaintiff was again recommended for transfer to LCC, but then remained at HDSP because he was found guilty on additional disciplinary charges stemming from the possession of contraband at ESP and had to serve an additional disciplinary sanction. There is no evidence in the record to support any contention that the mistaken transfer to ESP was actually a retaliatory move by Neven or Russell. In fact, there is no evidence that Neven or Russell had any involvement in Plaintiff's move from HDSP to ESP. Plaintiff's allegation that Neven and/or Russell were behind the move to ESP appears to be entirely speculative.

In his declaration, Russell states he does not recall if he ever responded to any of Plaintiff's grievances, but contends he has not threatened any inmate over grieving him or any other person. If a grievance is inappropriate, Russell would reject it and the inmate would be advised as to the reason and how to fix it. He maintains he never told Plaintiff he would ensure Plaintiff would disappear. In addition, he did not have authority to order Plaintiff be transferred to ESP as all transfers are initiated by Offender Management Division (OMD). (Russell Decl., ECF No. 247-10.)

Plaintiff provides no evidence to refute Russell's statements. Plaintiff points to an updated case note entry made by Russell, which Plaintiff claims was somehow fraudulent; however, in the May 6, 2015 case note, Russell merely stated that Plaintiff was okay in HDSP close custody ad-seg while pending transfer to LCC.

1    There is no evidence that Neven or Russell retaliated against Plaintiff by moving him to

2  ESP. Therefore, summary judgment should be granted in their favor.

3                              **IV. RECOMMENDATION**

4    IT IS HEREBY RECOMMENDED that the District Judge enter an order:

5  (1) **DENYING** Plaintiff's request under Rule 56(d);

6  (2) **DENYING** Plaintiff's request to strike certain documents; and

7  (3) **GRANTING** Defendants' motion for summary judgment.

8    The parties should be aware of the following:

9    1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

10  this Report and Recommendation within fourteen days of being served with a copy of the Report

11  and Recommendation. These objections should be titled "Objections to Magistrate Judge's

12  Report and Recommendation" and should be accompanied by points and authorities for

13  consideration by the district judge.

14    2. That this Report and Recommendation is not an appealable order and that any notice of

15  appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

16  until entry of judgment by the district court.

17

18  Dated: June 8, 2021

19                                        William G. Cobb

20                                        William G. Cobb
                                          United States Magistrate Judge

21

22

23

22